# **<u>EXHIBIT A</u>**

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF DAKOTA | FIRST JUDICIAL DISTRICT |

Case Type: Employment

Vanessa Schneir,

    Plaintiff,

v.

Walgreen Co. d/b/a Walgreens, an Illinois corporation,

    Defendant.

**SUMMONS**

Court File No.

Judge:

THIS SUMMONS IS DIRECTED TO Walgreen Co.

    1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

    Jason Raether

    961 Trillium Ct.

    Eagan, MN 55123

    3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for

the relief requested in the complaint.

     **5. LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

     **6. ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Date: August 9, 2021

                                                                                       Jason Raether, Atty ID #394857  
                                                                                       961 Trillium Ct.  
                                                                                       Eagan, MN  55123  
                                                                                      raetherlaw@protonmail.com  
                                                                                      (612) 418-7497

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF DAKOTA | FIRST JUDICIAL DISTRICT |
| | Case Type: Employment |

Vanessa Schneir,

    Plaintiff,

v.

Walgreen Co. d/b/a Walgreens, an Illinois corporation,

    Defendant.

**COMPLAINT**

Court File No.

Judge:

---

Vanessa Schneir, as and for her Complaint against Walgreen Co. d/b/a Walgreens ("Walgreens"), states and alleges as follows:

## PARTIES, VENUE, AND JURISDICTION

1. Schneir is a natural born resident and is a resident of Dakota County, Minnesota.

2. Walgreens is a corporation incorporated under the laws of the State of Illinois, with its primary place of business located in Lake County, Illinois. Walgreens primary business involves the operation of a chain of pharmacy stores, and, to this end, Walgreens has operated stores in Minnesota for nearly a century.

3. As part of its chain of pharmacy stores, Walgreens operates Store #5081 (the "Store"), which is located at 4220 Lexington Ave. S., in Eagan, Minnesota. Walgreens is responsible for implementing and enforcing employment policies and procedures at the Store.

4. This Court has personal jurisdiction over Walgreens pursuant to Minn. Stat. § 543.19. Additionally, Walgreens is subject to the jurisdiction of Minnesota district courts due to its numerous and extensive business operations in the state of Minnesota.

5. Venue is proper in this Court because Walgreens is a Dakota County resident pursuant to Minn. Stat. § 542.09 and because a substantial portion of the events giving rise to Schneir's claims occurred in Dakota County

## FACTS

**Open Position – Pharmacy Technician**

6. Schneir is a Latino-American woman who is proud of her Cuban heritage.

7. In or around March 2020, Schneir became aware that Walgreens was hiring to fill one or more "pharmacy technician" positions at the Store. Schneir applied for this position through Walgreens's website.

8. As part of the hiring process, Schneir discussed the position with Joshua Belland, one of the Store's supervisors, and A.J. Steil, the Pharmacy Operations Manager. Specifically, Schneir confirmed that this open position involved skilled tasks related to pharmacy operations, as opposed to menial, general tasks.

9. Walgreens offers training courses to its pharmacy technician employees, described by Walgreens as Walgreens Pharmacy Technician Certification and Training (herein, "Certification Training"). The Certification Training is accredited by the American System of Health Systems Pharmacists ("ASHSP"). Pharmacy technicians who receive ASHSP-accredited training are generally likely to receive higher wages and more job offers than non-trained technicians.

10. Schneir discussed the Certification Training with Belland and Steil, as well. Belland and Steil unequivocally assured Schneir that she was eligible for this training.

11. Schneir received Walgreens's written job offer on or about April 4, 2020. According to this offer, Schneir was to start work at the Store as a pharmacy technician on April 8, 2020, with an hourly wage of $16.50. Schneir accepted this job offer based on Walgreens's representations regarding the nature of the expected job duties and because she relied on Walgreens's promise to provide the Certification Training.

2

12. In early April 2020, Victoria Slaughter replaced Belland as a Store supervisor and Jessica Thelemann replaced Steil as the Pharmacy Operations Manager.

**Shifting Job Duties**

13. When Schneir arrived for her first day of work at the Store, she discovered that her scheduled duties were evenly split between pharmacy operations, on one hand, and tasks related to retail operations at the Store, on the other.

14. Victoria Slaughter supervised retail operations at the Store during Schneir's employment with Walgreens. Slaughter assumed the role of Schneir's supervisor for work related to the Store's retail operations.

15. Schneir requested the opportunity to work shifts in the pharmacy. In response, Walgreens reduced Schneir's pharmacy duties while assigning her more work at the general cash register. By the end of July 2020, Schneir was working exclusively at the cash register with no time spent working in the pharmacy.

16. In or around June 2020, Walgreens hired a white employee as pharmacy technician, essentially replacing Schneir's position in the pharmacy.

17. Upon information and belief, Walgreens did not require that any of Schneir's white coworkers spend significant time performing retail tasks.

**Certification Training**

18. Schneir also requested the opportunity to begin the Certification Training. Walgreens effectively ignored these requests and, as a result, Schneir missed an enrollment deadline in May 2020.

19. Thelemann assured Schneir that Schneir would still have undergo Certification Training. To this end, Thelemann completed form for the Board of Pharmacy in which Thelemann requested that the Board of Pharmacy grant Schneir an extension.

20. Schneir also asked Slaughter about the possibility of undergoing Certification Training, Slaughter responded saying, "[P]ast managers made empty promises to you which I feel as if they let you down with that."

21. Walgreens never offered Certification Training to Schneir, despite offering it to similarly situated white employees around the same period.

**COVID-19 Testing Requirements**

22. Schneir took a short Florida vacation in July 2020. When Schneir returned from this trip, Slaughter insisted that Schneir take a COVID-19 test before returning to work: "Before you come back I need you to get [the COVID-19 test] done since you are going out of state and need [sic] we need to keep our team safe to the best of our ability."

23. Walgreens's written policy related to COVID-19 does not require an employee take a COVID-19 test merely because the employee traveled outside of the state.

24. When Schneir informed Slaughter that Walgreens did not require a COVID-19 test in these circumstances, Slaughter stated, "Our team feels unsafe with you leaving the state."

25. Schneir informed Paul McIntire, the district manager for the Store, that Slaughter was requiring a COVID-19 test despite Walgreens's policy to the contrary. Even after McIntire informed Slaughter the test was not required, Slaughter continued pressuring Schneir to take this test.

26. Some of Schneir's white coworkers left the state to visit areas with high rates of coronavirus transmission. Upon information and belief, Slaughter did not subject these employees to the same level of scrutiny regarding possible exposure of the virus and, further, did not require that these white employees undergo a COVID-19 test before returning to work.

27. Schneir was mortified that her supervisor would discuss Schneir's medical condition with her coworkers. Schneir also felt isolated and stigmatized, and she reasonably believed she would be blamed for any COVID-19 infection at the Store, regardless of the source. Schneir thus took the COVID-

4

19 test (which was negative), hoping that it would improve her relationship with Slaughter and her other coworkers. She was unfortunately mistaken.

**Hostile Workplace**

28. Throughout her employment at the Store, Schneir repeatedly heard coworkers making offensive remarks targeted towards non-white individuals, with particular hostility directed at Hispanics and Latino-Americans. For example, Schneir overheard coworkers stating that all people in the United States should speak English, not Spanish. Schneir's coworkers openly doubted that any Hispanic immigrants had entered this country legally.

29. Schneir reasonably believed that these comments could violate various anti-discrimination laws and thus Schneir raised her concerns to Slaughter.

30. Slaughter did not substantively respond to Schneir's report of offensive, racially insensitive behavior in the Store, instead suggesting the matter could be addressed at an upcoming meeting.

**The Sting Operation**

31. In early August 2020, Katie Murphy approached Schneir's register while Schneir was working at the Store. Murphy asked Schneir to sell her cigarettes.

32. Upon information and belief, Murphy was in a romantic relationship with Slaughter when this occurred.

33. Schneir had met Murphy before, both as a customer and in the company of Slaughter. Schneir knew that Murphy was of legal age, having reviewed Murphy's ID on previous occasions. Nevertheless, Schneir asked to see Murphy's ID.

34. Murphy did not have her ID, but she assured Schneir that Slaughter had approved the sale.

35. Schneir trusted that her supervisor would not violate Walgreens's policy and that Slaughter had, indeed, approved the sale.

**Constructive Termination**

5

36. Schneir met with Slaughter and McIntire on August 7, 2020, to discuss several issues.

37. Schneir raised her concerns regarding the Store's hostile workplace, providing specific examples of bad actors and their discriminatory conduct. Despite the serious nature and legal ramifications of Schneir's allegations, neither Slaughter nor McIntire appeared concerned with her allegations.

38. Upon information and belief, Walgreens never investigated, or issued discipline to any employees, related to the offensive conduct Schneir reported.

39. Instead of eliciting more information regarding Schneir's report, Slaughter accused Schneir of violated Walgreens's tobacco policy and then produced camera footage of Schneir selling cigarettes to Murphy.

40. Upon information and belief, Slaughter targeted Schneir with this sting operation due to Schneir's race and ethnicity. Schneir is aware of no other white employees who were subjected to a similar "sting."

41. McIntire and Slaughter explained Schneir would be reclassified as an employee in the Store's retail operations and that she would not receive any shifts in the pharmacy. McIntire and Slaughter further explained that Schneir would only receive $9 / hour for this new position.

42. Walgreens constructively terminated Schneir's employment when it removed all possibility of her working pharmacy shifts, when it cut her pay nearly in half, and when it reneged on its promise to provide the Certification Training.

**Personnel File**

43. Schneir submitted a written request for her personnel file on August 31, 2020. In this request, she provided an address for receipt.

44. Walgreens responded to this request on September 14, 2020, by sending a link to a file that contained no information.

6

45. Schneir repeated her request for her personnel file, explaining that the previous attachment was not valid.

46. Walgreens did not deliver Schneir her personnel file within the time allowed by law.

47. Walgreens eventually delivered a document it characterized as Schneir's personnel file. This file did not contain any of the following:

a. Any explanation as to why Walgreens shifted Schneir's duties to retail or why Walgreens did not fulfill its promise to provide the Certification Training;

b. Formal disciplinary actions or other substantive negative performance evaluations that would have justified demoting Schneir and cutting her pay in half; or

c. Any reference of the tobacco sale to Murphy.

**Damages**

48. Despite an ongoing, diligent search for equivalent employment since August 7, 2020, Schneir has suffered significant wage losses and will likely continue suffering wage loss into the future.

49. Schneir's wage losses are exacerbated by Walgreens's failure to provide the Certification Training and its refusal to provide her pharmacy shifts that would have allowed Schneir the opportunity to develop valuable skills.

50. Schneir suffered garden-variety emotional distress because of Walgreens's wrongful conduct and termination of her employment.

## CLAIMS

### Count 1
### MHRA Racial Discrimination - Disparate Treatment

51. Schneir re-states the foregoing paragraphs as if fully stated below.

52. The Minnesota Human Rights Act ("MHRA") forbids employers from subjecting an employee to disparate, negative treatment due to the employee's race or ethnicity. Minn. Stat. 363A.08, subd. 2(3).

53. Walgreens employed Schneir between April 8, 2020, and August 7, 2020.

54. Walgreens discriminated against Schneir based on her race or ethnicity when it removed her from all pharmacy shifts, when it reduced her pay, and when it refused to provide the Certification Training.

55. Walgreens adverse treatment of Schneir originated from animus directed at Schneir's race and ethnicity.

56. The discriminatory conduct described herein performed by Walgreens's managers and supervisors, acting in their official capacity as such.

57. As a result of Walgreens's wrongful conduct, Schneir has suffered wage losses and garden-variety emotional distress.

58. Schneir is entitled to a recovery of any costs and attorney fees related to this claim pursuant to the MHRA.

59. Schneir has suffered damages due to the wrongful conduct described here in an amount exceeding $50,000, with the exact amount to be determined by the factfinder.

**Count 2**
**MRA - Hostile Workplace**

60. Schneir re-states the foregoing paragraphs as if fully stated below.

61. The Minnesota Human Rights Act ("MHRA") forbids employers from fostering a hostile workplace that subjects an employee to intolerable working conditions due to the employee's race or ethnicity. Minn. Stat. 363A.08, subd. 2(3).

62. Walgreens employed Schneir between April 8, 2020, and August 7, 2020.

63. Through the acts described above, Schneir was subjected to a hostile work environment due to her race and ethnicity.

64. Schneir informed Walgreens's manager and supervisors about the hostile conditions in which she worked, though Walgreens failed to remedy these conditions.

8

65. As a result of Walgreens's hostile work environment, Schneir has suffered wage losses and garden-variety emotional distress.

66. Schneir is entitled to a recovery of any costs and attorney fees related to this claim pursuant to the MHRA.

67. Schneir has suffered damages due to the wrongful conduct described here in an amount exceeding $50,000, with the exact amount to be determined by the factfinder.

### Count 3
### MHRA Reprisal

68. Schneir re-states the foregoing paragraphs as if fully stated below.

69. The Minnesota Human Rights Act ("MHRA") forbids employers from retaliating against an employee who makes a good-faith report of conduct that violates the MHRA. Minn. Stat. 363A.15.

70. Walgreens employed Schneir between April 8, 2020, and August 7, 2020.

71. Schneir made a good faith report of conduct that violated the MHRA to Slaughter on August 6, 2020, and to Slaughter and McIntire on August 7, 2020.

72. In reprisal for her good-faith report, Walgreens demoted Schneir and cut her pay nearly in half.

73. As a result of Walgreens's reprisal, Schneir has suffered wage losses and garden-variety emotional distress.

74. Schneir is entitled to a recovery of any costs and attorney fees related to this claim pursuant to the MHRA.

75. Schneir has suffered damages due to the wrongful conduct described here in an amount exceeding $50,000, with the exact amount to be determined by the factfinder.

### Count 4
### Breach of Contract

76. Schneir re-states the foregoing paragraphs as if fully stated below.

77. Even at-will employers may be liable for breach of contract if the employer reneges on substantive conditions attached to a job offer.

78. Walgreens and Schneir entered a contract when Walgreens sent a job offer on April 4, 2020, and when Schneir accepted this offer on April 8, 2020.

79. Walgreens breached this contract with Schneir when, among other things, it assigned her to work substantial time a position different than the position offered, when it demoted her to another low-skilled position, and then it cut her salary by nearly half.

80. Schneir suffered actual and prospective damages from Walgreens's breach of contract in an amount exceeding $50,000, with the exact amount to be determined by the factfinder.

## PRAYER FOR RELIEF

Based on the above allegations and claims, Schneir prays for the following relief from this Court:

1. Granting judgment in favor of Vanessa Schneir and against Walgreen Co. in an amount exceeding $50,000, with the exact amount to be determined by the factfinder.

2. Awarding Vanessa Schneir for all recoverable costs and fees, including reasonable attorney fees, related to this action.

3. Such other relief as the Court determines is just and equitable.

Date: August 9, 2021

Jason Raether, Atty ID #394857
961 Trillium Ct.
Eagan, MN 55123
raetherlaw@protonmail.com
(612) 418-7497

## MINN. STAT. § 549.211 ACKNOWLEDGEMENT

The party on whose behalf the pleading is served acknowledges through their undersigned counsel that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

Date: August 9, 2021

_____
Jason Raether, Atty ID #394857
961 Trillium Ct.
Eagan, MN 55123
raetherlaw@protonmail.com
(612) 418-7497